*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0314P (6th Cir.)
File Name: 04a0314p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DOUGLAS ALAN STROMBACK,
*Plaintiff-Appellant/*
*Cross-Appellee,*

Nos. 02-2387/2388

*v.*

NEW LINE CINEMA,
*Defendant-Appellee/*
*Cross-Appellant,*

LARRY HESS, et al.,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-73898—John Corbett O'Meara, District Judge.

Argued: June 8, 2004

Decided and Filed: September 14, 2004

Before: MARTIN and SUTTON, Circuit Judges; QUIST,
District Judge.[*]

_____

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

_____

### COUNSEL

_____

**ARGUED:** Andrew J. Kochanowski, SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, Southfield, Michigan, for Appellant. Herschel P. Fink, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellees. **ON BRIEF:** Andrew J. Kochanowski, SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, Southfield, Michigan, for Appellant. Herschel P. Fink, HONIGMAN, MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Appellees.

_____

### OPINION

_____

GORDON J. QUIST, District Judge. Plaintiff, Douglas Alan Stromback ("Stromback"), sued Defendant, New Line Cinema ("NLC"), and others, alleging violations of the Copyright Act, 17 U.S.C. § 106, and the Lanham Act, 15 U.S.C. § 1125, and alleging various state law claims under Michigan and/or California law. Stromback's claims all arise out of his allegations that the movie "Little Nicky," which is owned and distributed by NLC, infringes Stromback's poem entitled "The Keeper" as well as his original treatment and outline of a screenplay based upon "The Keeper" poem entitled "The Keeper."[1] The district court granted summary judgment to NLC on all of Stromback's claims and dismissed

_____

[1] Stromback also sued the three credited screenwriters, Adam Sandler, Steven Brill, and Tim Herlihy, and two other individuals. Stromback eventually dismissed the screenwriters without prejudice and did not serve summons on the other two individuals. Therefore, the case proceeded only against NLC.

the case.  Stromback filed this timely appeal.  We affirm on all issues.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In late 1998 and early 1999, Stromback, an actor, aspiring screenwriter, and former professional hockey player, created an original poem entitled "The Keeper."  Stromback then created an original treatment and original outline of a screenplay based upon "The Keeper" poem and entitled each one "The Keeper."  Later, Stromback created several original screenplays of "The Keeper." Stromback registered the poem and a version of the screenplay with the Copyright Office.  Stromback also registered several versions of the screenplay with the Writers Guild of America.

Stromback alleges that in early 1999, he shared the poem and the screenplay with Larry Hess and John Apothaker to solicit their comments on his work. According to Stromback, Hess and Apothaker subsequently passed copies of "The Keeper" poem and screenplay to NLC.  In November 2000, NLC released a movie it produced called "Little Nicky," starring Adam Sandler.  Stromback alleges that after seeing "Little Nicky" in the theater, he realized that it contained substantial similarities to his works, including similarities in theme, character treatment and development, idiosyncratic character traits, and scene selection.  A description of the two works follows.[2]

### *The Keeper*

The registered screenplay version of "The Keeper" is a story about "Ted," who brings down the corrupt Governor of

---

[2]In its opinion, the district court stated that it was adopting Stromback's description of the two works in light of the fact that it was deciding substantial similarity at the summary judgment stage.

California, "John."  Racial themes are presented throughout the story.  Ted is white.  Ted's adoptive mother is "Martina," an older black lady.  Ted's grandfather, "Fred," is an 87-year-old black man who lives in a nursing home and is apparently losing his mental faculties.  When Ted was young, Fred taught Ted to speak in rhymes, as Ted often does throughout the story.  Fred thought that being able to rhyme was the secret to succeeding in life because Muhammed Ali spoke in rhymes.  Fred told Ted that he was teaching Ted how to rhyme so that Ted would deliver the family "from the gutter."  Ted regularly talks to himself in his apartment, apparently responding in a schizophrenic manner to voices inside his head.  Ted asks Martina to explain the voices and why he is troubled but she is reluctant to tell him the truth, which is that he was abandoned in a dumpster as a baby by his birth mother.  Eventually, Ted's mother told him that they found him on church grounds and that his mother was an eighteen year old girl who was having an affair with a politician.

The story opens with Ted starting a new job at the "national paper."  Ted is hired to work in the basement of the building organizing old files.  Ted's boss, "Dave," calls the basement "the cave" or "the dungeon."  Ted works in the evening and often sleeps during work.  Ted is attracted to a female writer named "Sue."  Ted concocts and carries out a plan to approach Sue in the dark and reveal his feelings toward her through a rhyme. Sue figures out that Ted was the person who approached her in the dark but she won't date him because he is "totally weird."

Shortly after he begins working at the national paper, Ted begins to obsess about Governor John.[3]  Governor John is

---

[3]Stromback claims that the reader can infer that the politician with whom Ted's birth mother had the affair was Governor John's father, making Governor John Ted's evil brother or half-brother. However, the only basis for this inference is Stromback's subjective reading of the text.

portrayed as a power hungry politician who does no real work and whose ambition is to become president and take over the world. Ted believes that Governor John is "cocky and arrogant" as well as evil, and at various times Ted refers to Governor John as the devil. Ted begins a campaign against Governor John by sending anonymous rhyming riddles to the national paper that the newspaper prints in its editorial page. Eventually it is revealed that Ted has been reading about a "Jokela murder case," in which a reporter ("Jokela") was murdered in the same basement in which Ted now works. Jokela discovered that the then-secretary of state (Governor John's father) was involved in a cult having "some thing to do with the devil." Governor John's father was the prime suspect in the murder but "got off the hook and the case never went to trial." He went on to have a distinguished career as Governor. Ted knows that Governor John's father was responsible for the murder and includes clues about it in his riddles.

Governor John reads the riddles and eventually catches on that the author is out to get him. The Governor and his henchmen decide to kill "that rhyming dude." Ted reveals himself to the Governor and dares him to "get me if you can." Governor John arranges for three individuals to find and murder Ted at the national paper. However, Ted sets a trap in which he uses his "good friend," "Scott," to trick the hit-man into thinking that Scott is actually Ted. The hit-man ends up killing Scott. Having video-taped the murder, Ted tells a dying Scott: "I needed you, you were a good friend, but everybody needs a ladder to get to the top. You're my ladder scott [sic]."

Ted shows the tape of the murder to the police, who eventually link the murder to Governor John. The story ends with the Governor going to jail and Ted being elected as the Governor of California. On election night Sue goes to Ted's hotel room, where he rapes her. Sue has no recourse because Ted now has the power. Ted calls Sue a "bitch" as she leaves.

### *Little Nicky*

Little Nicky is a "comedy" about the Devil, "Satan," and his three sons: "Casius," the strong, tough son; "Adrian," the smart, ruthless son; and "Nicky," the weaker, sweet son, who also has a speech impediment caused by his brother hitting him in the face with a shovel. Adrian and Casius frequently pick on Nicky and "mind wrestle" with him, causing him to do or say things against his will. The grandfather, "Lucifer" (Rodney Dangerfield), appears occasionally but does not really interact with Nicky.

The movie opens with Satan trying to decide if he should retire after 10,000 years of rule. If he does, one of his sons would take over Hell. Casius and Adrian both want the job. Nicky does not want it and prefers that his father keep the job. Satan decides to keep the job and rule for another 10,000 years in order to maintain the balance between good and evil (he does not believe that his sons are capable of doing this). Casius and Adrian are furious at this decision and plan to escape to Earth, where they will try to corrupt as many souls as possible (to threaten the balance between good and evil) in their quest to assume control. During their escape, Casius and Adrian travel through a wall of fire, by which damned souls are intended to fall into, but not leave, Hell. Adrian and Casius cause the wall of fire to freeze and a logjam of souls ensues outside the wall of fire. Without new souls entering, Satan begins to decompose. His only hope is to send Nicky to Earth to force his brothers to drink from a magic flask, in which they will be trapped. Once he has his brothers inside the flask, Nicky must pass through the wall of fire and return to Hell, which will save Satan.

Nicky travels to New York City, where Satan's friend, a talking dog, "Beefy," serves as Nicky's guide. Nicky is also assisted by two cult-worshiping "groupies" named "John" and "Pete." Beefy, John, and Pete all want Nicky to "release his inner evil" in order to overpower Casius and Adrian. Nicky

has a difficult time finding his brothers because they hide by randomly "possessing" humans. Casius possesses the Mayor of New York and lowers the drinking age from 21 to 10, causing chaos. All three of them have a difficult time adapting to Earth's cold weather.

While on Earth, Nicky meets and falls in love with a woman named "Valerie." During a chance encounter, Adrian mind wrestles with Nicky and causes him to insult Valerie. However, Nicky wins back Valerie's affection by telling her the truth about his family and mission on Earth. During the story, Nicky is killed several times (e.g., by a train or bus) and is sent back to Hell, where he is re-dispatched to Earth. The final time, Nicky dies trying to save Valerie and goes to Heaven. There, he meets an angel named "Holly," who turns out to be his mother. Holly tells Nicky that she met Satan at a "Heaven and Hell Mixer." Holly tells Nicky releasing his inner good is the key to victory over his brothers. Holly also gives Nicky a magic sphere from God for Nicky to use when it is time.

Nicky manages to trap Casius in the magic flask, but Adrian has assumed the throne of Hell and has caused Hell to rise through Central Park in New York. At the stroke of midnight, all of New York's souls will be damned and belong to Adrian in Hell. Nicky uses the magic sphere, releasing "good" versus "evil." Nicky smashes the magic sphere and Ozzy Osbourne (a rock star with a reputation for biting the heads off bats) appears and bites off Adrian's head (who appears in the form of a bat) and spits it into the magic flask. Nicky then commits one last superficially bad act to ensure that he will be sent to Hell. Valerie tells Nicky that she loves him and then smashes him on the head with a rock (out of love) to kill him and send him back to Hell. Satan is saved and the balance between good and evil is restored. Satan sends Nicky back to Earth to be with Valerie and they have a son and live happily ever after.

Stromback filed his complaint on October 15, 2001, and filed an amended complaint in December 2001.[4] Stromback's amended complaint alleged claims for copyright infringement; reverse passing off in violation of the Lanham Act; commercial misappropriation; breach of quasi contract; misappropriation of trade secrets; breach of the implied duty of good faith and fair dealing; unfair competition/unjust enrichment; and interference with prospective economic advantage. On September 13, 2002, NLC, the only remaining defendant, moved for summary judgment. At that time, the case had been pending for about a year and Stromback had not sought a Rule 16 conference with the district court, nor had he sought any discovery. In his response, Stromback argued that summary judgment should be denied because he needed to conduct discovery on whether the various screenplays leading up to the final product (the movie) infringed on "The Keeper" poem or screenplay. The district court found that the movie was the only relevant work because only the movie, and not the various versions of the screenplays leading up to the movie, were published to the public and because Stromback alleged in his amended complaint only that the movie was an infringing work. The district court concluded that NLC was entitled to summary judgment on the copyright infringement and Lanham Act claims because no reasonable jury could find that "Little Nicky" is substantially similar to "The Keeper" poem or screenplay. The district court also concluded that summary judgment was proper on Stromback's state law claims on the basis that they are preempted by § 301 of the Copyright Act.

---

[4] In addition to alleging that "Little Nicky" infringed "The Keeper," Stromback also initially alleged that the movie "Mr. Deeds" was an infringing work. Stromback eventually dropped the allegation regarding "Mr. Deeds."

## II. ANALYSIS

### A. Standard of Review

Stromback contends that the district court erred in granting summary judgment to NLC on his various claims. In reviewing a district court's grant of summary judgment, this Court applies a *de novo* standard. *See E.I. Du Pont De Nemours & Co. v. Okuley*, 344 F.3d 578, 584 (6th Cir. 2003). Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).

### B. Copyright Infringement Claim

The Copyright Act provides protection for original works of authorship expressed in various media. 17 U.S.C. §§ 101-1332. Subject to certain exceptions not applicable here, the owner of a copyright has the exclusive rights (1) to reproduce the copyrighted work; (2) to prepare derivative works; (3) to distribute copies; (4) to perform publicly a copyrighted work; and (5) to display publicly a copyrighted work. 17 U.S.C. § 106. A plaintiff may bring a claim against a person who infringes any of the plaintiff's exclusive rights in a copyright under § 106 by demonstrating two elements: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296 (1991); *accord Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). The parties do not dispute Stromback's ownership of a valid copyright in "The Keeper" poem and screenplay. Thus, copying is the only issue in dispute.

Since direct evidence of copying is rarely available, a plaintiff may establish "an inference of copying by showing (1) access to the allegedly-infringing work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992). "Access is essentially 'hearing or having a reasonable opportunity to [view] the plaintiff['s] work and thus having the opportunity to copy.'" *Ellis*, 177 F.3d at 506 (quoting *Tree Publ'g Co. v. Warner Bros. Records*, 785 F. Supp. 1272, 1274 (M.D. Tenn. 1991)). In *Ellis*, we observed that in some cases the relationship between the degree of proof required for similarity and access may be inversely proportional: where the similarity between the two works is strong, less compelling proof of access may suffice, and vice-versa. *Id.* at 507. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (stating that under the "inverse ratio rule," a lower standard of proof of similarity is required where a high degree of access is shown); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir. 1946) (stating that "a case could occur in which the similarities were so striking that we would reverse a finding of no access, despite weak evidence of access (or no evidence thereof other than the similarities)"). For purposes of its motion for summary judgment, NLC conceded the issue of access, electing to focus solely on the issue of substantial similarity of the two works.

In ruling on NLC's motion, the district court observed, correctly, that the Sixth Circuit had not formally adopted a specific test or approach for determining substantial similarity in copyright cases. Drawing on statements in *Diffie* as well as prior decisions from the Eastern District of Michigan, the district court applied the "ordinary observer" test, which allows the trier of fact to gauge his "net impression" of the two works by conducting a side-by-side comparison without the benefit of expert testimony or dissection. (Dist. Ct. Op. at 8.) The district court rejected Stromback's argument that it should apply the two-part test employed by the Ninth Circuit,

which consists of an extrinsic test and an intrinsic test, *see Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), although the district court did state that summary judgment would be improper at that stage if the Sixth Circuit employed the "extrinsic" test because expert discovery had not occurred. Subsequent to the district court's opinion and order granting summary judgment and dismissing the case, this court adopted a two-part test in *Kohus v. Mariol*, 328 F.3d 848 (6th Cir. 2003), which follows the test employed by the D.C. Circuit in *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002). We stated that "the first step 'requires identifying which aspects of the artist's work, if any, are protectible by copyright,' [and] the second 'involves determining whether the allegedly infringing work is "substantially similar" to protectible elements of the artist's work.'" *Kohus*, 328 F.3d at 855 (quoting *Sturdza*). This test is really just a refinement of the ordinary observer test that, as its initial step, parses from the work the elements neither afforded copyright protection nor properly considered in the ordinary observer test. "The essence of the first step is to filter out the unoriginal, unprotectible elements–elements that were not independently created by the inventor, and that possess no minimal degree of creativity, through a variety of analyses." *Id.* (citation omitted). Our test is similar to the Ninth Circuit's test, because the first part, like the Ninth Circuit's extrinsic test, requires a determination of only the expressive elements of a work, while the second part, like the Ninth Circuit's intrinsic test, asks whether the ordinary, reasonable observer would find the works, taken as a whole, to be substantially similar. *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 318 (6th Cir. 2004).

However, significant differences remain in both parts. In particular, we apply a more stringent standard regarding when to allow expert testimony on the first part of the test. Also, not having adopted the eight *Kouf* factors [*Kouf v. Walt Disney Pictures & Television*, 16

F.3d 1042 (9th Cir. 1994)], the first part of our test remains more free in form than the Ninth Circuit's extrinsic test.

*Id.* In addition, for purposes of summary judgment, the Ninth Circuit considers only the extrinsic test, while the intrinsic test is reserved for the jury. *See Kouf*, 16 F.3d at 1045 ("A plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact."). In contrast, a court considers both parts of our test in determining substantial similarity on a motion for summary judgment. *See Kohus*, 328 F.3d at 857-58 (discussing the district court's analysis on remand under both prongs of the test). This remains consistent with our prior observation that while summary judgment in favor of a defendant in a copyright case is a practice that should be used sparingly, in an appropriate case, "a court may compare the two works and render summary judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity." *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) (citations omitted); *accord Kohus*, 328 F.3d at 853.

Our decision in *Kohus* answers one of Stromback's central arguments on appeal, namely, that the district court erred by conducting a side-by-side comparison of the two works rather than applying the extrinsic/intrinsic test or some other test that allows for analytic dissection of what Stromback characterizes as "complex copyright subject matter." Though the district court failed to apply the proper two-part test, we need not remand the case because the issue presented is one of law. *See, e.g., Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Trust Co.*, 93 F.3d 1064, 1072 (2d Cir. 1996) ("An appellate court has the power to decide cases on appeal if the facts in the record adequately support the proper result or if the record as a whole presents no genuine issue as to any material fact. . . . Thus, if we find that a party must prevail as a matter of law, a remand is unnecessary.") (internal quotation

marks and citations omitted); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1539 (10th Cir. 1996) ("In the present case, the debate is purely legal, and remand on this issue is unnecessary"). That is, the district court applied the ordinary observer test – the second part of the *Kohus* test – without first filtering out the unoriginal, unprotectible elements of "The Keeper" poem and screenplay. To the extent that the district court considered both protectible and unprotectible elements of Stromback's works, the inquiry for purposes of this appeal remains the same – whether the district court's conclusion of no substantial similarity was correct.[5]

Nor is remand required for consideration of expert testimony, as the district court believed might be the case under the extrinsic/intrinsic test. Even in the Ninth Circuit expert testimony is not a requisite for a copyright infringement case. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994) (stating that a court may use expert testimony, "if necessary," to determine whether any of the allegedly similar features are subject to copyright protection). Our test "appl[ies] a more stringent standard regarding when to allow expert testimony on the first part of the test." *Murray Hill Publ'ns, Inc.*, 361 F.3d at 318. We remanded in *Kohus* in part because the copyright involved a latch for a portable children's play yard, and we thought that expert testimony would be necessary to determine whether certain elements of such a latch should be excluded from the substantial similarity analysis. *See Kohus*, 328 F.3d at 856. Whether expert testimony should be allowed in a particular case remains a matter committed to the discretion of the trial court under Federal Rule of Evidence 702 if such testimony

---

[5] Although the district court did not purport to apply the two-part test, it in fact did so as part of its analysis when it observed that many of the alleged similarities, such as the concepts of Hell and the devil, are too commonplace and not protected.

"will assist the trier of fact to understand the evidence or to determine a fact in issue." However, where, as here, the subject matter is not complex or technical, such as a computer program or a functional object, *see, e.g.*, *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 834-35 (10th Cir. 1993) (noting that in most cases involving computer programs expert testimony will be helpful to the court in applying an abstractions test), but instead involves a literary work aimed at a general audience, expert testimony will seldom be *necessary* to determine substantial similarity. *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 123 (1930) (Hand, Learned) ("[Expert testimony] ought not to be allowed at all; and while its admission is not a ground for reversal, it cumbers the case and tends to confusion, for the more the court is led into the intricacies of dramatic craftsmanship, the less likely it is to stand upon the firmer, if more naive, ground of its considered impressions upon its own perusal."); *Kindergartners Count, Inc. v. Demoulin*, 249 F. Supp. 2d 1214, 1232 (D. Kan. 2003) ("Unlike technical computer programs, the trier of fact does not need an expert to compare two literary works that are expressed in simple English."); *Costello v. Loew's Inc.*, 159 F. Supp. 782, 789 (D.D.C. 1958) ("No amount of expert or lay testimony as to fancied similarities could change the obvious content of the exhibits before the court . . . . Nor could expert testimony affect the spontaneous and immediate impression of the plaintiff's and defendant's literary works upon the mind of the ordinary observer."). Therefore, we reject Stromback's suggestion that expert testimony is necessary in this case.

### 1.  Filtering of Unprotected Elements

Although there is no clear line separating protected from nonprotected work, two principles help to guide that determination in this case. *See Kohus*, 328 F.3d at 855-56. First, copyright protection extends only to expression of ideas and not to ideas themselves. 17 U.S.C. § 102(b); *Mazer v. Stein*, 347 U.S. 201, 217, 74 S. Ct. 460, 470 (1954) ("Unlike

a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea – not the idea itself."). "Ideas are free to the world, and one person's idea can be appropriated by another with impunity." *Taylor v. Metro-Goldwyn-Mayer Studios*, 115 F. Supp. 156, 157 (S.D. Cal. 1953). "[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work – termed "expression" – that display the stamp of the author's originality." *Feist Publ'ns*, 499 U.S. at 350, 111 S. Ct. at 1290 (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547, 105 S. Ct. 2218, 2224 (1985)) (internal quotation marks omitted). The abstraction test articulated by Judge Learned Hand in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (1930), provides some guidance in divining protected expression:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Id.* at 121. The test itself does not identify protectible elements of a work, but instead is a tool for accomplishing that task. *Kohus*, 328 F.3d at 855.

Second, the principle of *scenes a faire* excludes copyright protection for "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 616 (7th Cir. 1982); *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer") § 13.03[F][3] (2004). For example,

parties, alcohol, co-eds, and wild behavior are natural elements in a story about a college fraternity. Similarly, "[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about . . . policemen in the South Bronx," and therefore are not afforded copyright protection. *Walker v. Time Life Films*, 784 F.2d 44, 50 (2d Cir. 1986); *see also Murray Hill Publ'ns, Inc*, 361 F.3d at 319-20 (citing examples).

Stromback relies upon numerous examples to support his claim of substantial similarity between the works. As Stromback concedes, however, many of these elements are superficial, e.g., the Hell/dungeon setting, the sequence of certain events (main characters leaving Hell, battling their brother, the attempted killing of the main character), racial allusions and a love interest. These are common themes and ideas throughout literature and are beyond any level of abstraction at which copyright protection might begin to attach. *See Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002) ("Familiar stock scenes and themes that are staples of literature are not protected."). The same is true for character traits or descriptions such as "whacked," "odd," "misfit," "evil," or "conflicted"; themes, such as saving the world, the battle between good and evil, sibling rivalry or familial secrets and issues, and racial issues; scenes, such as parties; concepts, such as a dam or barrier between Earth and Hell; and plots, such as foiling the antagonist's attempt to rule the world. *See generally Nichols*, 45 F.2d at 122 ("A comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet."); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38, 49 (D.D.C. 1999) ("The general concept of an interracial relationship . . . is not copyrightable.") (citing *Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir. 1998)). These elements are too general to qualify for copyright protection.

## 2.    Comparing the Works

After filtering out the unprotectible elements such as ideas and *scenes a faire*, the final step is to determine whether the allegedly infringing work is "substantially similar" by comparing the two works. *Wickham*, 739 F.2d at 1097. Substantial similarity exists where "the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996) (internal quotation marks and citation omitted). In *Murray Hill* we wrote:

"A story has a linear dimension: it begins, continues, and ends. If a defendant copies substantial portions of a plaintiff's sequence of events, he does not escape infringement by adding original episodes somewhere along the line." "The misappropriation of even a small portion of a copyrighted work may constitute an infringement under certain circumstances." "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." "No plagiarist can excuse the wrong by showing how much of his work he did not pirate."

361 F.3d at 320 (citations omitted). In a case such as this, it is appropriate to examine the theme, characters, plot, sequence, pace, and setting for similarities. *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996). "However, 'random similarities scattered throughout the works' may be discounted." *Murray Hill Publ'ns, Inc.*, 361 F.3d at 320 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). In the end, the question is whether, based upon his "net impression" of the works' expressive elements, the

ordinary lay observer would find them substantially similar to one another. *See, e.g.*, *Ellis*, 177 F.3d at 506 n.2.

Having reviewed "The Keeper" poem and screenplay and "Little Nicky," we are unable to find *any* similarity between the works other than at perhaps the most superficial level. Casting aside the many stock themes, *scenes a faire*, and raw ideas cited by Stromback, we are left with two works that are completely dissimilar in both their overall look and feel and in their constituent expressive elements.

The respective themes, plots, moods, and settings of the works are dissimilar. "The Keeper" is a dark, disturbing, and humorless story about real people. Its theme is difficult to discern, but it appears to be that power and success in life can be attained through rhyming. The story takes place in California, and much of it occurs in the basement of the national paper where Ted works. While at the national paper Ted is attracted to a woman, Sue, who spurns him because he is "weird." Ted dislikes the corrupt Governor and at some point figures out that the Governor was connected with a cult of devil worshipers and had something to do with a murder. In an effort to bring down the Governor, Ted sends a series of rhyming clues to the national paper that ultimately reveal the Governor's connection to the murder.[6] Ted refers to the Governor as "evil" and "the antichrist" several times throughout the story, but this is only his use of a metaphor, as there is never any suggestion that Governor John actually is the devil. The Governor eventually figures out that Ted is the "rhyming dude" and sends henchmen to kill Ted. Ted betrays his friend, Scott, by leading a henchman to believe that Scott

---

[6]The district court and the parties state that the Governor was responsible for the murder, but the text of "The Keeper" suggests that the Governor's father committed the murder ("Well the big deal is that a prime suspect in the case was the secretary of the state. . . . Well, the secretary of states [sic] kid is now the governor. The one that will be the next president."). (J.A. at 334-35.)

is Ted. After the henchman shoots Scott, Ted reveals to Scott that he used Scott as his "ladder." In the end, Ted becomes Governor and uses his power to exact revenge on Sue by raping her.

In contrast, "Little Nicky" is a comedy about the devil and his three sons. The predominant theme in "Little Nicky" is that good should and will prevail over evil. The story takes place in Hell, New York City, and Heaven. Little Nicky, the youngest of the three sons, is sent to Earth to bring back his two brothers, Casius and Adrian, who have escaped from Hell as part of their plan to assume control. Nicky must bring his brothers back to Hell in order to restore the balance of good and evil and to save his father, Satan. On Earth, Nicky meets and falls in love with Valerie. After dying and returning to Hell several times, Nicky ends up in Heaven and discovers that his mother is an angel. Just as Adrian is about to prevail and claim all of the souls of New York City, Nicky returns to Earth and, using the magic sphere his mother gave him, bottles Adrian in the magic flask. After Nicky returns his brothers to Hell, Satan sends Nicky back to Earth, and Nicky and Valerie have a son and live happily ever after.

The main characters, Ted and Nicky, are markedly different. Ted is portrayed as a slick and scheming character whose most prominent trait is that he speaks in rhymes, often as a means to deceive and lure women. For example, in one scene, Ted tells a waitress that he would like her "ass," but when she responds in apparent disgust he says "I would like your bass, bass ale." Ted reveals his evil side at the end of the story by betraying his friend and raping the woman who rejected him. In contrast, as a son of the devil, Nicky is unexpectedly portrayed as sweet, good-hearted, and naive. Nicky succeeds in the end by using his inner good and ultimately saves the world by restoring the balance of good and evil.

The list of similarities cited by Stromback is extensive, but nonetheless insufficient to render the two works substantially similar. Some of the alleged similarities do not exist, others are overstated, and, to the extent there are similarities, they are simply too general or tenuous to meet the legal standard for similarity. By way of example, Stromback says that Ted is shown as a riddler and a punner and claims that the same "wordplay" occurs in Nicky's character development, but this is simply not true. Unlike Ted, Nicky does not speak in rhymes or use wordplay. Likewise, Stromback claims that Ted and Nicky both assume the same burden – saving the world and souls. But, a fair read of "The Keeper" shows that Ted's true concern is his own self-interest. While there are some similarities – for example, references to Hell and the devil and interracial families – Stromback's claim fails because the similar details are trivial or scattered details. *See Williams*, 84 F.3d at 590-91. "Where as here, the slight similarities are not thematically related, the whole is no greater than the sum of the parts." *Murray Hill Publ'ns, Inc.*, 361 F.3d at 325. Thus, the district court was correct in concluding that a reasonable person could not conclude that NLC copied protected expression from "The Keeper."

In spite of the absence of similar protectible elements in both works, Stromback contends that NLC's admission of access precludes a finding of no substantial similarity as a matter of law. This argument is easily rejected, because without substantial similarity, there can be no inference of copying, and thus, no infringement. In *Wickham v. Knoxville International Energy Exposition, Inc.*, 739 F.2d 1094 (6th Cir. 1984), we held that because there was no substantial similarity, access was irrelevant: "No amount of proof of access will suffice to show copying if there are no similarities." *Id.* at 1097; *accord Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir.1946) ("Of course, if there are no similarities, no amount of evidence of access will suffice to prove copying.").

Finally, Stromback contends that the district court erred in granting summary judgment to NLC because it should have allowed discovery on the underlying and prior versions of the screenplay in order to permit Stromback to fully develop his claim. Stromback points out that he alleged not only that the movie "Little Nicky" infringed his copyright in "The Keeper," but also that NLC substantially copied and prepared versions of "The Keeper." Stromback contends that discovery was necessary to this portion of his claim and was relevant to address the question of how the movie "Little Nicky" was prepared in light of NLC's election not to rely upon independent creation as a defense. The district court rejected Stromback's request because only the movie was published to the public and because Stromback alleged in his amended complaint only that the movie was an infringing work. We think that this was the correct result. In deciding infringement claims, courts have held that only the version of the alleged infringing work presented to the public should be considered. *See Davis v. United Artists, Inc.*, 547 F. Supp. 722, 724 n.9 (S.D.N.Y. 1982) ("Since the ultimate test of infringement must be the film as produced and broadcast, we do not consider the preliminary scripts."). "Courts have routinely rejected requests to consider earlier drafts of the screenplay. Consideration of earlier versions of the screenplay is too unreliable in determining substantial similarity." *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 435 (S.D.N.Y. 1985); *see also Madrid v. Chronicle Books*, 209 F. Supp. 2d 1227, 1234 (D. Wyo. 2002) (quoting *Walker* and refusing to grant the plaintiff's request for discovery on the development of the defendant's movie because such discovery would be "pointless"). As the *Madrid* court noted, the "intermediate copying" concept has only been recognized in a very limited application to cases involving computer programs – because of the complex nature of the subject. *Id.* at 1236. Because this is not such a case, there is no need to apply the concept. Furthermore, in spite of Stromback's assertion to the contrary, the district court's assessment of the amended complaint was accurate because Stromback only alleged that the movie "Little Nicky" infringed "The Keeper" poem and screenplay.

## C.  Lanham Act Claim

Stromback also contends that the district court erred in granting summary judgment on his claim for reverse passing off under Section 43 of the Lanham Act. Where a plaintiff's Lanham Act claim parallels his copyright infringement claim, a finding of no substantial similarity on the copyright claim precludes the Lanham Act claim. *Mihalek Corp. v. Michigan*, 814 F.2d 290, 296 (6th Cir. 1987); *see also Litchfield v. Spielberg*, 736 F.2d 1352, 1358 (9th Cir. 1984) (stating that "without substantial similarity there can be no claim for reverse passing off" under the Lanham Act). Stromback makes no attempt to distinguish his Lanham Act claim from his copyright infringement claim or to explain how there could be a likelihood of confusion when the two works are not substantially similar. Therefore, summary judgment was proper.

## D.  State Law Claims

The district court concluded that NLC was entitled to summary judgment on all of Stromback's state law claims on the ground that they were subject to copyright preemption. On appeal, Stromback takes issue only with the district court's dismissal of his claims for commercial misappropriation, misappropriation of trade secrets, and interference with prospective economic advantage claims.

Section 301 of the Copyright Act provides that:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as defined by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the

subject matter of copyright . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 310(a). A state law claim will be preempted under Section 301 where two requirements are met. First, the work must come within the scope of the "subject matter of copyright" as set forth in Sections 102 and 103 of the Copyright Act. *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001). Second, the rights granted under state law must be equivalent to any of the exclusive rights within the scope of federal copyright protection. *Id.* These requirements are often referred to as the "subject matter requirement" and the "general scope" or "equivalency" requirement. *Id.* (citing *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997)).

### 1. Subject Matter Requirement

The subject matter requirement of Section 301 is satisfied if a work fits within the general subject matter of Sections 102 and 103 of the Copyright Act, regardless of whether it qualifies for copyright protection. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 676 (7th Cir. 1986) (quoting H.R. Rep. No. 94-1476, at 131, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5747). In *Wrench*, this court joined several other circuits in holding that for purposes of preemption, the scope of the Copyright Act's subject matter is broader than the scope of its protection. *Wrench*, 256 F.3d at 454-55. Stromback's claims meet the subject matter requirement because "The Keeper" poem and screenplay fall squarely within the range of materials protected by the Copyright Act; that is, they are both original literary works "fixed in [a] tangible medium of expression." 17 U.S.C. § 102(a). Stromback does not dispute that the poem and screenplay meet the subject matter requirement, but he does argue that his commercial misappropriation claim avoids

preemption on this basis because it relates to "the time, effort, and money that [Stromback] expended" as well as NLC's unauthorized "uses" of Stromback's efforts. (Appellant's Br. at 55-56.) This argument ignores the principle cited above, that the subject matter of copyright is broader than its protections. Thus, Stromback's citation to *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 338, 111 S. Ct. 1282 (1991), for the proposition that there is no copyright protection for "sweat of the brow" efforts is not germane to the subject matter inquiry. Moreover, even assuming that Stromback's time, effort, and money constitute a separate element of his claim, it would still be within the subject matter of copyright because the claim is based upon NLC's unauthorized use of "The Keeper" poem and screenplay. *Cf. Nat'l Basketball Ass'n*, 105 F.3d at 848 ("We hold that where the challenged copying relates in part to the copyrighted broadcasts of the games, the subject matter requirement is met as to both the broadcasts and games."). Moreover, Stromback's argument that Section 106 of the Copyright Act does not grant a copyright owner the exclusive right to "use" a work is sophistry. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 (5th Cir. 1999) ("Use of a copyrighted work by one who does not own the copyright constitutes infringement under federal law, provided the use falls within the scope of a copyright owner's exclusive rights.") (footnote omitted).

### 2. Equivalency Requirement

Courts analyze equivalency by applying "a functional test" to determine whether the state law right at issue is equivalent to any of the exclusive rights under Section 106 of the Copyright Act. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994). In *Wrench*, we stated:

Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would

infringe one of the exclusive rights. Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.

256 F.3d at 456 (citation omitted). *See also Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1440 (9th Cir. 1993). The existence of an extra element precludes preemption only where the element changes the nature, rather than the scope, of the action. *Data Gen.*, 36 F.3d at 1164-65.

### a. *Commercial Misappropriation*

Stromback alleges in his commercial misappropriation claim that Stromback "expended significant time, effort, and money" to create "The Keeper" screenplay with "the expectation that he would reap the benefits of the production of the screenplay into a film for commercial sale" and that NLC misappropriated the poem and screenplay, including its characters, scenes and events and will reap the benefits that Stromback was expecting. (1st Am. Compl. ¶¶ 48-49, J.A. at 242.) The essence of this claim is that NLC copied portions of "The Keeper" poem and screenplay. Courts faced with similar misappropriation claims have held them to be preempted by the Copyright Act because they allege an act that infringes upon one of the exclusive rights set forth in Section 106. *See, e.g., Daboub v. Gibbons*, 42 F.3d 285, 289 (5th Cir. 1995) (concluding that the plaintiffs' claims, including misappropriation, were preempted because they merely alleged wrongful copying, distribution and performance of lyrics without alleging an extra element rendering the claim different from a copyright infringement claim); *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985) (finding "no distinction" between the state law right asserted in the misappropriation claim and the exclusive rights granted

under the Copyright Act); *Artie Fields Prods., Inc. v. Channel 7 of Detroit, Inc.*, No. 94-CV-70730-DT, 1994 WL 559331, at *2-3 (E.D. Mich. June 10, 1994) (holding that the plaintiff's misappropriation and unfair competition claims grounded solely in the copying of the plaintiff's protected expression were preempted); 1 Nimmer § 1.01[B][1][f][iii] ("Except for a few stray rulings, legions of cases . . . have held preempted claims for misappropriation") (citations omitted). Of course, a misappropriation claim will survive preemption if it alleges an extra element, such as a confidential or fiduciary relationship. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992). However, Stromback's assertion that his claim is based upon the time, effort, and money that he expended in developing the screenplay is not an extra element that saves his claim from preemption. *See Del Madera Props. v. Rhodes & Gardner, Inc.*, 820 F.2d 973, 976-77 (9th Cir. 1987) (finding the plaintiff's misappropriation claim preempted because the "[e]ffort expended to create a Tentative Map and supporting documents is effort expended to create tangible works of authorship" and "[a]s such, this effort is within the scope of copyright protection"); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985) (rejecting as preempted the plaintiff's unfair competition/misappropriation claim alleging misappropriation of the plaintiff's time, effort, and talent). Therefore, this claim is preempted.

### b. *Misappropriation of Trade Secrets*

Count VI of Stromback's first amended complaint alleged a claim for misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. §§ 445.1901-.1910, and under Michigan and California

common law.[7]   Under Michigan law, the elements of a common law claim for misappropriation of trade secrets are: (1) the existence of a trade secret; (2) the defendant's acquisition of the trade secret in confidence; and (3) the defendant's unauthorized use of it. *Aerospace Am., Inc. v. Abatement Techs., Inc.*, 738 F. Supp. 1061, 1069 (E.D. Mich. 1990) (citing *Kearns v. Ford Motor Co.*, 203 U.S.P.Q. 884, 888 (E.D. Mich. 1978)).  MUTSA displaces common law trade secret misappropriation claims arising after October 1, 1998 – the effective date of MUTSA.  M.C.L. § 445.1910. Stromback alleged in his complaint  that "Defendants had a duty not to disclose or exploit confidential information acquired from [Stromback]"; that "Defendants were aware that the information obtained by [sic] Stromback was confidential information and/or trade secrets"; that "Defendants disclosed and exploited the confidential information they received from [Stromback], without Stromback's permission"; and that Stromback has been damaged as a result of "[Defendants'] breaches of their duty of confidentiality." (1st Am. Compl. ¶¶ 64-67, J.A. at 246.)

In concluding that the misappropriation of trade secrets claim was preempted, the district court lumped it together with Stromback's commercial misappropriation claim, stating that it was "substantively no different than [the] commercial misappropriation claim."  In doing so, however, the district court failed to recognize that a considerable number of cases have held that misappropriation of trade secrets claims are not preempted because they require proof of a confidential relationship, which provides the extra element required to survive preemption.  For example, in *Computer Associates*

---

[7]The district court did not decide whether Michigan or California law applies to this claim, and it appears that the parties did not raise the issue in their briefing. We find it unnecessary to address the choice of law issue at this point.

*International, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992), the Second Circuit stated:

> [M]any state law rights that can arise in connection with instances of copyright infringement satisfy the extra element test, and thus are not preempted by section 301. These include unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets.
>
>      . . . .
>
> Trade secret claims often are grounded upon a defendant's breach of a duty of trust or confidence to the plaintiff through improper disclosure of confidential material.  The defendant's breach of duty is the gravamen of such trade secret claims, and supplies the "extra element" that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying.

*Id.* at 717 (citations omitted).  *See also Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 218 (3d Cir. 2002) ("We agree with Geac that if their misappropriation of trade secrets claim was based on such breach of duty of trust and confidentiality, it would survive preemption in this case."); *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 737-38 (S.D.N.Y. 1996) (holding that because "plaintiff's claim for trade secret misappropriation require[d] proof of a breach of confidence, it [was] not preempted by federal law"); 1 Nimmer § 1.01[B][1][h] ("Actions for disclosure and exploitation of trade secrets require a status of secrecy, not required for copyright, and hence, are not preempted.") (footnotes omitted).  Several courts have held that claims brought under state trade secret statutes modeled on the Uniform Trade Secrets Act, such as MUTSA, survive preemption because the required proof of the existence and breach of a confidential relationship provides the extra

element necessary to survive preemption. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994) (holding that a claim under Massachusetts trade secret law was not preempted "because participation in the breach of a duty of confidentiality – an element that forms no part of a copyright infringement claim – represents unfair competitive conduct qualitatively different from mere unauthorized copying"); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (holding that a claim under the Maryland Uniform Trade Secrets Act was not preempted because it "require[d] proof of a breach of trust or confidence"); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1090 n.13 (9th Cir. 1989) (noting that a claim under the California Uniform Trade Secrets Act would not involve a legal or equitable right equivalent to an exclusive right of a copyright owner under the Copyright Act); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847-48 (10th Cir. 1993) ("Because Gates' claim for trade secret misappropriation under the Colorado Uniform Trade Secrets Act requires proof of a breach of trust or confidence – proof that is not required under the Copyright Act – Gates' state law claims are not preempted by federal law."); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549 (11th Cir. 1996) (expressing "no doubt that the Florida trade secret statute at issue satisfies the 'extra element' test generally employed by courts in performing copyright preemption analysis"). Because proof of a confidential relationship is a necessary element in a trade secret misappropriation claim under both the common law and uniform trade secrets laws such as MUTSA, we hold that Stromback's trade secrets misappropriation claim is not preempted by Section 301; proof of a confidential relationship and its breach provide an extra element.

In noting that Stromback did not argue that there was an extra element, such as a fiduciary relationship, the district court failed to undertake the proper inquiry in an equivalency

analysis.[8] In *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir. 1993), the Fourth Circuit stated that in determining equivalency, a court should compare "the elements of the causes of action . . ., not the facts pled to prove them." *Id.* at 659. *See also Gates Rubber Co.*, 9 F.3d at 847 (examining elements of the state cause of action for misappropriation of trade secrets to determine whether the extra element requirement was met); *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1543 (10th Cir. 1996) (following *Trandes Corp.*). We believe that *Trandes Corp.* provides an accurate statement of the law *generally*, where the state law claim itself furnishes the extra element needed to avoid equivalency. In this case, for example, the district court could have determined the preemption issue solely by examining the elements for a trade secrets misappropriation claim under Michigan law. Because a plaintiff alleging such a claim must prove the existence and breach of a confidential relationship, the claim itself is not preempted. Whether the plaintiff has actually alleged the proper elements of the claim goes to the question of whether the claim could survive a Rule 12(b)(6) motion to dismiss, not whether the claim is preempted. *See Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1131 (N.D. Cal. 2001) ("The defendants' contention that the plaintiff has failed to allege a confidential relationship and their citation to *Design Art* address the merits of the plaintiff's trade secret claim, not whether that claim is preempted by the Copyright Act.").

---

[8] NLC contends that because Stromback did not argue to the district court that there was a fiduciary relationship with NLC, the argument should be precluded on appeal. While we will generally decline to consider on appeal issues not considered by the district court, we do recognize an exception where the issue presents only a question of law. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 n.9 (6th Cir. 1998) (quoting *City Mgm't Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 255 (6th Cir. 1994)). Here we address the issue of a confidential relationship as part of our legal analysis.

Nonetheless, a court may be required to review the facts as pled by the plaintiff in order to determine whether the acts giving rise to the state law claim are merely acts of copyright infringement. *See Sturdza*, 281 F.3d at 1304 ("To determine whether a state law claim is qualitatively different from a copyright claim – that is, whether the state claim has an 'extra element' – courts generally examine both the elements of the state law cause of action and the way the plaintiff has actually pled that cause of action."). For example, a conversion claim will usually survive preemption because the tort relates to the unauthorized exercise of dominion and control, or interference with, another's personal property. *See, e.g.*, *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456-57 (5th Cir. 2003) (holding that conversion claim under Texas law survived preemption); *United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) ("It is hornbook law that a state law action for conversion will not be preempted if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying its work.") (internal quotations and citations omitted). Where the conversion claim involves intangible property, a court should examine the plaintiff's allegations to determine whether the state law right is equivalent to one of the exclusive rights under Section 106. *See Daboub*, 42 F.3d at 289-90 (holding that the conversion claim was preempted where the plaintiffs alleged that the defendants improperly copied, distributed, and performed their song); *Berge*, 104 F.3d at 1463 (holding conversion claim preempted because "what is crucial is that Berge makes no claim that appellants converted any tangible objects embodying her intellectual property"). Likewise, a promise in a breach of contract claim may suffice as an extra element, but this determination must be based upon a review of the plaintiff's allegations. *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F. Supp. 2d 953, 958 (N.D. Ill. 2002). We followed this approach in *Wrench*. Although we examined Michigan law regarding contracts implied in fact and contracts implied in law, it was necessary to also examine the plaintiffs' breach of

contract allegations to determine whether the promise was a "promise to pay for the use of the work," which would not have been preempted, or merely "a promise to refrain from reproducing, performing, distributing or displaying the work," which would have been preempted. *Wrench*, 256 F.3d at 457. Similarly, in *Murray Hill Publications, Inc. v. ABC Communications, Inc.*, 264 F.3d 622 (6th Cir. 2001), we set forth the law in Michigan regarding conversion and then determined from the plaintiffs' allegations that the claim was preempted because it met the equivalency requirement. *Id.* at 636-37.

Although the district court incorrectly determined that the misappropriation of trade secrets claim was preempted, this panel may affirm if the decision was correct for any reason, including one the district court did not consider. *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 330 F.3d 747, 750 (6th Cir. 2003). We conclude that dismissal was proper because, as a matter of law, "The Keeper" poem and screenplay were not trade secrets and, even if they were, there was no misappropriation. In order to constitute a trade secret under MUTSA, information alleged to be a trade secret must "[d]erive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." M.C.L. § 445.1902(d)(i). Thus, the essence of a trade secret is that it derives its value from secrecy. Here, Stromback could not possibly argue that his poem and screenplay had "independent economic value" because he kept them secret. Those works would have "independent economic value" only if they were exploited publicly through broad dissemination. Furthermore, even if Stromback's poem and screenplay had some independent economic value from being held in secrecy, Stromback could not prove misappropriation. As set forth above, "The Keeper" poem and screenplay and "Little Nicky" are not at all similar. The only similarities arise from common and well-known themes, plots, and character traits

that "are readily ascertainable by other means," *id.*, and therefore cannot constitute trade secrets.  Because we have concluded that the two works are not substantially similar, no reasonable juror could conclude that NLC misappropriated any trade secrets from Stromback's works.

###   c.    *Interference with Prospective Economic Advantage*

Stromback's final state law claim is a claim for interference with prospective economic advantage.  The elements of the claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by the defendant; (3) intentional interference by the defendant which induces or causes a breach or termination of the relationship or expectancy; and (4) damage to the plaintiff. *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 698, 552 N.W.2d 919, 925 (1996) (per curiam).  Stromback's allegations in support of this claim are that he "had a legitimate expectation of a future economic benefit from the development of his poetry and screenplay"; that NLC "knew that the use of [Stromback's] poem and screenplay would interfere with [his] reputation and [its] development . . . within the film industry"; and that NLC's "actions in misappropriating the poem and screenplay including the characters, character interplay, scenes and events . . . and passing them off as [its] own in the production of 'Little Nicky' . . . were made with the intent that [Stromback's] expected relationships would be disrupted." (1st Am. Compl. ¶¶ 77-79, J.A. at 248.)

Generally, tortious interference claims (with contract or prospective economic advantage) are held to be preempted because the rights asserted in such claims are not qualitatively different from the rights protected by copyright. *See, e.g., Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1193 (C.D. Cal. 2001) (holding that the plaintiff's claim for negligent interference with prospective economic advantage did "not protect any right 'qualitatively different' from those

rights protected by copyright"); *Titan Sports, Inc. v. Turner Broadcasting Sys., Inc.*, 981 F. Supp. 65, 74 (D. Conn. 1997) ("The right that Plaintiff's contracts with Hall and Nash seeks to protect is Plaintiff's exclusive ownership right in its copyrighted material – precisely what the Copyright Act seeks to protect."); *Aqua Bay Concepts, Inc. v. Grosse Point Bd. of Realtors*, No. 91-CV-74819, 1992 WL 350275, at *4 (E.D. Mich. May 7, 1992) ("There is no indication that the state allegation of contractual interference is 'qualitatively different' from the copyright infringement claim."). According to Professor Nimmer,

> Insofar as unauthorized reproduction, distribution, performance or display causes the plaintiff to lose the benefits that would flow from an actual or prospective contract whereby plaintiff would authorize any such acts, the rights created by the tort of contract interference do not appear to differ qualitatively from rights under copyright; copyright also contemplates loss of actual or prospective contract benefits by reason of such unauthorized acts.  Pre-emption in this context would, then, appear to be justified.  The fact that the tort, unlike copyright infringement, requires awareness of the conflicting contract and an intentional interference with it merely means that the state-created right is narrower than its copyright counterpart, not that it is qualitatively different so as to preclude pre-emption.

1 Nimmer § 1.01[B][1][a] (footnotes omitted).  *See also Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539, 105 S. Ct. 2218 (1985) (finding the tortious interference claim preempted because unauthorized publication was the basis for the violation and the elements of awareness and intentional interference pled in the tortious interference claim did not render the claim different from a copyright claim).

Here, Stromback's tortious interference claim arises out of NLC's alleged copying, display, and distribution of "The Keeper" poem and screenplay – acts which also violate the exclusive rights granted by Section 106. This claim is based upon activity which constitutes copyright infringement and is preempted because it is not "qualitatively different" from a copyright infringement claim. We reject Stromback's argument that the development of his reputation is an extra element that somehow renders the claim different from a copyright infringement claim. The bottom line is that the foundation of Stromback's claim is NLC's violation of rights that are granted under and protected by the Copyright Act.

## III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.