# STATE OF MICHIGAN

# COURT OF APPEALS

POLYTORX, L.L.C.,

      Plaintiff-Appellant,

v

UNIVERSITY OF MICHIGAN REGENTS,

      Defendant-Appellee.

UNPUBLISHED
May 7, 2015

No. 318151
Court of Claims
LC No. 13-000064-MK

POLYTORX, L.L.C.,

      Plaintiff-Appellee,

v

ANTOINE NAAMAN, SHERIF EL-TAWIL, and
DONG JOO KIM,

      Defendants-Appellants.

and

JU YOUNG KIM, JI YUNG KIM, and SAMBO
CONSTRUCTION MACHINE COMPANY,
LTD.,

      Defendants.

No. 320989
Washtenaw Circuit Court
LC No. 13-000495-CZ

Before: MURRAY, P.J., and HOEKSTRA and WILDER, JJ.

PER CURIAM.

In Docket No. 318151, plaintiff-appellant, Polytorx, LLC, appeals as of right the September 10, 2013 Court of Claims order granting summary disposition to defendant-appellee, University of Michigan Board of Regents ("U of M"). In Docket No. 320989, defendants-

-1-

appellants, Antoine Naaman, Sherif El-Tawil, and Dong Joo Kim, appeal by leave granted the March 5, 2014 Washtenaw Circuit Court order denying in part their motion for summary disposition of plaintiff-appellee, Polytorx, LLC's claims.[1] This Court consolidated the appeals. We affirm the Court of Claims order in Docket No. 318151 and reverse the portion of the circuit court order in Docket No. 320989 denying defendants' motion for summary disposition and granting summary disposition to Polytorx. We also remand to the circuit court for entry of an order granting defendants' motion for summary disposition in full.

I
A

As a student in 1998, Luke Pinkerton received a research grant at U of M in the graduate studies program to work with Antoine Naaman, a professor at U of M, to develop steel fiber reinforcements (Torex) in concrete for commercial application. The research resulted in "production technology," a term the parties use to refer to a design book containing the process for refining the fibers and the machine designed to mass produce them. The technology allegedly constituted a breakthrough for concrete reinforcement in that it was efficient, cost-effective, and more environmentally-friendly than other methods.

According to the complaints, when Pinkerton completed his graduate studies, he turned over a design book, drawings, and instructions for use of the machine to Naaman, and in 1999, Pinkerton and Naaman, as 50% coinventors, signed a declaration attesting their mutual desire for U of M to market, protect, and license the fibers and machine. According to Pinkerton, U of M required the pages of the design book to be stamped "confidential," and it was understood that all information and any further research surrounding the fibers and production technology would be confidential and performed under Naaman.

Patents for the fibers were issued to U of M on November 23, 1999 and May 9, 2000; Naaman was listed as the inventor. However, U of M did not apply for a patent for the machine or any technology in the accompanying design book.

In 2003, Pinkerton created a start-up business, Torex International, LLC, to manufacture and distribute the fibers as an extension of the work he conducted with U of M as a graduate student. According to the complaints, after Torex International, LLC was created, (1) U of M agreed that the production technology would continue to be a trade secret, (2) U of M and Torex International, LLC agreed that nondisclosure agreements (NDAs) would be obtained from anyone working on related research under Naaman and U of M professor Sherif El-Tawil, and (3) Naaman and El-Tawil signed NDAs.

On June 26, 2003, Pinkerton, through Torex International, LLC, entered into a license agreement with U of M. U of M granted Torex International, LLC, "a worldwide exclusive license . . . with the right to grant sublicenses . . . to make, have made, import, use, market, offer

---

[1] *Polytorx LLC v Antoine Naaman*, unpublished order of the Court of Appeals, entered May 19, 2014 (Docket No. 320989).

for sale and sell LICENSED PRODUCTS and to practice LICENSED PROCESSES."[2]  U of M reserved the right to "practice the patent rights" for research and educational purposes.

Shortly after the license agreement was entered, Torex International, LLC changed its name to Polytorx, LLC.  In its complaint, Polytorx claimed it, not Torex International LLC, was the real party in interest.  Hereinafter, we will refer to Torex as Polytorx.

According to the complaints, in October 2003, Polytorx delivered a machine designed by Pinkerton to U of M to enable it to proceed with research on the fibers, and at that time, Polytorx and U of M agreed not to apply for a patent on the machine but to instead protect the confidentiality of the production technology as a trade secret.

Polytorx also alleged in the complaints that, thereafter:  (1) Naaman worked with an offshore company in Taiwan to attempt to produce and sell the fibers, offered the competing fibers to a Polytorx customer, and told the customer that Polytorx's product did not work, (2) Naaman worked with El-Tawil, Ju Young Kim, and Ji Yung Kim to commercialize the production and sale of the fibers by utilizing protected information, and (3) Dong Joo Kim, a U of M graduate student, asked to inspect Polytorx's facility and machine, indicating that he had relatives in Korea who were interested in commercializing the product, but Polytorx declined the request.  Letters on behalf of Polytorx from Pinkerton and William Orabone, CEO of Polytorx at the time, to U of M in 2007 addressed these concerns.

From 2007 through 2009, Dong Joo Kim and Naaman continued their twisted steel fiber research.  In 2009, they filed a patent application for a machine designed to test the impact resistance of Polytorx's fibers in reinforced concrete.  In 2009, Korean company Sambo Construction filed a patent application for a machine to produce twisted steel fibers; Ju Young Kim and Ji Yung Kim were listed as the inventors.  The patent was not published until April 20, 2012, and Pinkerton claimed he did not discover it until September 2012.  In the complaints, Polytorx alleged that Sambo Construction's machine was taken directly from the design book

---

[2] The agreement defined "licensed products" as "any steel fiber product or product part, which: (a) is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS in the country in which any such product or product part is made, used, imported, offered for sale or sold; or (b)  is manufactured by using a LICENSED PROCESS or is employed to practice a LICENSED PROCESS."  It also provided:

> LICENSED PRODUCT includes fiber products, but does not include an entire aggregate mixture including fiber products.  For the sake of clarity, if [Polytorx] makes sales of a steel fiber product or product part (or equipment or process for making the same) in combination with other materials (e.g. an aggregate mixture) (or equipment or process for making the same), LICENSED PRODUCT includes only the steel fiber products (or equipment or process for making the same).

The agreement defined "licensed process" as "[a]ny process or method that is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS."

provided by Pinkerton to U of M. Polytorx also alleged that, in March 2013, it discovered that the machine and design book had been stolen or converted and was no longer at U of M.

B

Polytorx filed a complaint against U of M in the Court of Claims on May 13, 2013, asserting that U of M breached the license agreement. Thereafter, Polytorx filed a Amended Complaint in the Court of Claims, asserting claims of breach of the license agreement (count I), misappropriation of confidential and proprietary information and trade secrets in violation of both Michigan's Uniform Trade Secret Act (UTSA) and the common-law (count II), and unjust enrichment (count III).

The Court of Claims subsequently granted U of M's motion for summary disposition and dismissed Polytorx's action, reasoning that there was no genuine issue of material fact regarding the latest date on which Polytorx's claims accrued and U of M was entitled to judgment as a matter of law because Polytorx failed to file notice of its claim within one year of the claim's accrual. The Court of Claims also alternatively ruled that a claim that the parties agreed to keep the production technology confidential was barred by the merger and amendment clause in the license agreement.

C

On the same date that Polytorx filed its original claim against U of M in the Court of Claims, Polytorx filed a complaint in Washtenaw Circuit Court against Naaman, El-Tawil, Dong Joo Kim, Ju Young Kim, Ji Yong Kim, and Sambo Construction. In count I, Polytorx alleged tortious interference with contract and business relationship, claiming damages from both harm to its reputation and loss of business from defendants' competition, as well as damages resulting from the disclosure of trade secrets to the public. In count II, Polytorx alleged misappropriation of confidential and proprietary information and trade secrets in violation of both UTSA and the common-law. In count III, Polytorx alleged statutory and common law conversion of confidential and proprietary information and trade secrets. In count IV, Polytorx alleged unjust enrichment from the misappropriation of confidential and proprietary information and trade secrets. Finally, in count V, Polytorx alleged civil conspiracy to commit tortious interference, misappropriation, conversion, and unjust enrichment.

Defendants moved for summary disposition, which the circuit court denied, in part. Instead, the circuit court granted summary disposition to Polytorx, ruling that there was no question of fact that it was entitled to trade secret protection under MCR 2.116(I)(2). Next, the circuit court ruled that there was a question of fact regarding when Polytorx knew defendants were misappropriating the trade secrets involving the production technology, noting there was no direct reference to it in the 2007 letters. Therefore, dismissal on statute of limitation grounds was not appropriate. The circuit court agreed with defendants that the unjust enrichment allegations were not distinct from the UTSA allegations and dismissed the unjust enrichment count under a theory of preemption. But, contrary to defendants' arguments, the circuit court ruled that several claims, including tortious interference and conversion, involved allegations distinct from misappropriation so they were not entirely preempted by UTSA and could not be dismissed. Regarding conversion, the trial court noted that a question of fact existed whether

Polytorx suffered damages from the conversion of the physical property, including the machine and design book, as opposed to damages from merely conversion of the confidential and proprietary information and trade secrets related to this production technology. Finally, the circuit court ruled that the claim of civil conspiracy was not preempted by UTSA because some of its predicate claims (tortious interference and conversion) were not displaced by UTSA.

II

Polytorx argues the Court of Claims erred by granting U of M's motion for summary disposition because there was no genuine issue of material fact regarding the latest date on which its claims accrued and U of M was entitled to judgment as a matter of law because Polytorx failed to file notice of its claim within one year of the claim accruing. We disagree.

The Court of Claims did not specify on the record whether it granted U of M's motion for summary disposition under MCR 2.116(C)(7), (8), or (10). Because the Court of Claims considered material outside the pleadings, this Court construes the motion as having been granted pursuant to MCR 2.116(C)(10).[3] *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "This Court reviews de novo a trial court's decision on a motion for summary disposition." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). When deciding a motion brought under MCR 2.116(C)(10), this Court reviews the evidence in a light most favorable to the party opposing the motion, and reviews the entire record, including affidavits, depositions, admissions, or other documentary evidence, to test the factual adequacy of a complaint. *Id*. "Summary disposition is appropriate . . . if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

Under the Court of Claims Act, MCL 600.6401 *et seq*., the Court of Claims has exclusive jurisdiction over all tort-based and contract-based claims against the state. *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 768-769, 772-773; 664 NW2d 185 (2003); MCL 600.6419. The Court of Claims Act provides two time-limits that a claimant must meet. First, a claimant must give notice to the state, either through filing a claim or written notice of a claim. Specifically, MCL 600.6431(1) provides:

> *No claim may be maintained against the state unless the claimant, within 1 year after such claim has accrued, files* in the office of the clerk of the court of claims *either a written claim or a written notice of intention to file a claim* against the state or any of its departments, commissions, boards, institutions, arms or agencies, stating the time when and the place where such claim arose and in detail

---

[3] Because we construe the motion as having been granted pursuant to MCR 2.116(C)(10), we decline to address Polytorx's argument that, if the motion was granted pursuant to MCR 2.116(C)(8), the Court of Claims should have, *sua sponte*, allowed Polytorx to amend its pleadings.

the nature of the same and of the items of damage alleged or claimed to have been sustained, which claim or notice shall be signed and verified by the claimant before an officer authorized to administer oaths.[4] [Emphasis added.]

Second, MCL 600.6452(1) provides that the claim against the state "shall be forever barred unless the claim is filed . . . within 3 years after the claim first accrues." In other words, the state must receive notice within one year of when the claim accrues and the claim itself must be filed within three years of when the claim accrues. The act further provides that "[e]xcept as modified by this section, the provisions of RJA chapter 58 [MCL 600.5801, *et seq*.], relative to the limitation of actions, shall also be applicable to the limitation prescribed in this section." MCL 600.6452(2). MCL 600.5869 provides, in relevant part, "All actions and rights shall be governed and determined according to the law under which the right accrued."

A

The elements of breach of contract are: "(1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Miller-Davis Co v Ahrens Constr, Inc* (*On Remand*), 296 Mich App 56, 71; 817 NW2d 609 (2012).

Polytorx gave notice of the breach of license agreement claim to U of M on May 13, 2013, by filing a complaint in the Court of Claims. Accordingly, the breach on which Polytorx's claim is based must have accrued no later than May 13, 2012. MCL 600.5827 provides in part that the "period of limitation runs from the time the claim accrues," which "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." In the Court of Claims, a claim accrues for purposes of MCL 600.3431(1) when the "the suit may be maintained thereon." *Cooke Contracting Co v State*, 55 Mich App 336, 338; 222 NW2d 231 (1974).

Again, in their 2007 letters, Pinkerton and Orabone maintained U of M breached the license agreement when they claimed Naaman and his students were involved with using confidential information to produce, and attempted to sell, competing fibers. These claims were barred by the one-year notice provision in MCL 600.6431(1) because Polytorx did not file the complaint until six years later. Polytorx maintains that a breach of license agreement claim nevertheless survives to the extent that it relates to the disclosure of production technology for purposes of the Sambo Construction machine patent. But that claim is also time-barred because the patent was filed in 2009. If the production technology was disclosed in violation of the license agreement, as Polytorx alleges, there is no genuine issue of fact that it must have been disclosed before the patent was actually filed in 2009, or earlier. Therefore, at the very latest, the claim accrued in 2009, *Cooke Contracting Co*, 55 Mich App at 338, notice would have been

---

[4] The purpose of this section is to "apprise the governmental agency that an action is contemplated, so that they may take appropriate measures to gather evidence before the requisite information is lost." *In re Estate of Fair v State Veterans Facility of Mich*, 55 Mich App 35, 39; 222 NW2d 22 (1974).

required under MCL 600.6431(1) by 2010, and the May 13, 2013 filing of the complaint was untimely. We therefore conclude that the Court of Claims did not err by granting summary disposition in favor of U of M on Polytorx's breach of license agreement claim.

We reject Polytorx's assertion that it satisfied the one-year-notice requirement for the breach of license agreement claim because it did not discover the Sambo Construction machine patent until September 2012, or that the production technology was missing until March 2013. Historically, under the discovery rule, the statute of limitations began to run when the plaintiff discovered, or through reasonable diligence, should have discovered, an injury and the causal connection between the plaintiff's injury and the defendant's breach. *Moll v Abbott Laboratories*, 444 Mich 1, 15-16; 506 NW2d 816 (1993). However, the discovery rule now applies only if the Legislature provides for the discovery rule in a statute. *Trentadue v MFO Mgt Co*, 479 Mich 378, 388-392; 738 NW2d 664 (2007). MCL 600.5807(8) proscribes the statute of limitations for a breach of contract claim and does not provide for tolling on the basis of discovery. Michigan courts have rejected the proposition that a discovery rule may operate to toll accrual of a breach of contract claim. *Dewey v Tabor*, 226 Mich App 189, 193; 572 NW2d 715 (1997); see also *Scherer v Hellstrom*, 270 Mich App 458, 463 n 2; 716 NW2d 307 (2006) (overruling the circuit court's application of a discovery rule to delay the commencement of the breach of contract period of limitation); *Michigan Millers Mut Ins Co v West Detroit Bldg Co, Inc*, 196 Mich App 367, 372 n 1; 494 NW2d 1 (1992), overruled in part on other grounds by *Miller-Davis Co v Ahrens Constr, Inc*, 489 Mich 355 (2011) ("A breach of contract claim accrues on the date of the breach, not the date the breach is discovered."). In addition, the Court of Claims Act does not provide for tolling based on discovery. Thus, the date on which Polytorx discovered the Sambo Construction machine patent is irrelevant for purposes of applying the one-year notice requirement under MCL 600.6431(1).[5]

B

Misappropriation of trade secrets has three elements: "(1) the existence of a trade secret, (2) the defendant's acquisition of the trade secret in confidence; and (3) the defendant's unauthorized use of it." *Stromback v New Line Cinema*, 384 F3d 283, 302 (CA 6, 2004).[6] Michigan's UTSA defines a trade secret as "any information, including a formula, pattern, compilation, program, device, method, technique, or process" that "derives independent economic value . . . from not being generally known to . . . other persons who can obtain economic value from its disclosure or use," and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." MCL 445.1902(d)(*i*) and (*ii*). Under UTSA, a

---

[5] Given our conclusion that summary disposition was proper because the claim was time-barred by MCL 600.6431(1), we decline to address U of M's argument whether Polytorx satisfied that statute's time, place, and nature of the claim requirements.

[6] It is appropriate to look to the law of other jurisdictions to interpret Michigan's UTSA. See *Power Press Sales Co v MSI Battle Creek Stamping*, 238 Mich App 173, 180; 604 NW2d 772 (1999).

complainant is entitled to recover damages for the misappropriation of trade secrets. MCL 445.1904; see also MCL 445.1902(b) (defining "misappropriation").

Again, MCL 600.6431 requires notice within one year after a claim has accrued. Polytorx filed the first-amended complaint including its UTSA claim on August 28, 2013. Therefore, to satisfy the one-year notice provision, this claim could not accrue earlier than August 28, 2012.

Although the discovery rule does not apply to Polytorx's breach of license agreement claim, as discussed earlier in Section II-A, we agree with Polytorx that there is a statutory basis for the discovery rule involving UTSA. MCL 445.1907 provides, "An action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim." Because the Court of Claims Act, MCL 600.6452(2), incorporates the provisions of the Revised Judicature Act, including MCL 600.5869, which provides, in relevant part, "All actions and rights shall be governed and determined according to the law under which the right accrued," UTSA and its discovery rule in MCL 445.1907 govern when the UTSA claim accrued in the Court of Claims.

The focus of the parties' dispute on appeal is whether a question of fact exists regarding when the UTSA claim should have been discovered. U of M claims that the conduct alleged amounts to a continuing misappropriation of trade secrets and Polytorx should have discovered the alleged misappropriation by 2007, when Naaman purportedly used confidential information to produce and attempt to sell the fibers to a customer through a Taiwanese company. Polytorx only counters that the 2007 letters evidencing its knowledge of Naaman's conduct make no specific reference to any breach of the confidentiality of the production technology. Polytorx's argument is unpersuasive. Under Polytorx's own interpretation of the license agreement, U of M's only authorized use of the production technology was for research and educational purposes. Moreover, the production technology is necessary to produce and sell the fibers. Therefore, if Naaman attempted to sell the fibers in 2007, he necessarily used the production technology in an unauthorized manner, even if he did not actually disclose any allegedly confidential information about the production technology at that time. Therefore, there was no question of fact that the UTSA claim accrued in 2007, *Cooke Contracting Co*, 55 Mich App at 338, notice would have been required by 2008, and pursuant to the one-year notice provision, the August 28, 2013 filing of the first-amended complaint was untimely. The Court of Claims did not err by granting summary disposition in favor of U of M on Polytorx's UTSA claim.

C

Again, misappropriation of trade secrets has three elements: "(1) the existence of a trade secret, (2) the defendant's acquisition of the trade secret in confidence; and (3) the defendant's unauthorized use of it." *Stromback*, 384 F3d at 302. The elements of an unjust-enrichment claim are "(1) receipt of a benefit by the defendant from the plaintiff, (2) which benefit it is inequitable that the defendant retain." *Dumas v Auto Clus Ins Ass'n*, 437 Mich 521, 546; 473 NW2d 652 (1991) (quotation marks and citation omitted).

Polytorx first notified U of M of the tort claims (common law misappropriation and unjust enrichment) in the August 28, 2013 first-amended complaint. MCL 600.5805(1) and (10) and MCL 600.5827 provide that the period of limitations for an action in tort runs three years from the time the claim accrues, regardless of the time when damage results. Like the breach of contract claim, Polytorx cites no statutory provision triggering the discovery rule for these claims. *Trentadue*, 479 Mich at 388-392.

As we discussed in Section II-B, there is no question of fact that Polytorx should have been aware as early as 2007 that Naaman was using the production technology for commercial purposes contrary to Polytorx's interpretation of the license agreement. Therefore, the misappropriation claim accrued by 2007. *Cooke Contracting Co*, 55 Mich App at 338. Notice would have been required by 2008, and pursuant to the MCL 600.6431(1) one-year notice provision, the August 28, 2013 filing of the first-amended complaint was untimely. The Court of Claims did not err by granting summary disposition in favor of U of M on Polytorx's common law misappropriation claim.

According to Polytorx's allegations about the Sambo Construction machine patent, the production technology must have been disclosed—contrary to the license agreement—before the application was filed in 2009, and while U of M continued to accept royalties from Polytorx for protecting the production technology from disclosure under the license agreement. Therefore, at the very latest, a claim for unjust enrichment accrued in 2009, *Cooke Contracting Co*, 55 Mich App at 338, notice would have been required under MCL 600.6431(1) by 2010, and the May 13, 2013 filing of the complaint was untimely. The Court of Claims did not err by granting summary disposition in favor of U of M on Polytorx's unjust enrichment claim.

III

Next, defendants in the circuit court action allege that, to the extent Polytorx's claims involved the protection of the production technology as a trade secret, the claims were properly dismissed because the license agreement did not require U of M to protect any trade secrets related to the production technology and, given the merger clause in the license agreement, U of M had no obligation to protect any trade secrets related to the production technology independent of the license agreement. We agree.

A

" 'A contract must be interpreted according to its plain and ordinary meaning.' " *Wells Fargo Bank, NA v Cherryland Mall Ltd Partnership* (*On Remand*), 300 Mich App 361, 386; 835 NW2d 593 (2013), quoting *Holmes v Holmes*, 281 Mich App 575, 593; 760 NW2d 300 (2008).

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. [*Klein v HP Pelzer Auto Sys, Inc*, 306 Mich App 67, 75-76; 854 NW2d 521 (2014) (citations and quotation marks omitted).]

The license agreement, effective June 26, 2003, provided:

> 2.1 [U of M] hereby grants to [Polytorx] a worldwide exclusive license in all fields with the right to grant sublicenses, both subject to the terms and conditions of this Agreement to make, have made, import, use, market, offer for sale and sell LICENSED PRODUCTS and to practice LICENSED PROCESSES.
>
> 2.2 [U of M] reserves the right for [U of M] and its subsidiaries to practice the PATENT RIGHTS for research, internal and/or educational purposes.

The license agreement defined "licensed products" as any steel fiber product or product part, which:

> (a) is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS in the country in which any such product or product part is made, used, imported, offered for sale or sold; or
>
> (b) is manufactured by using a LICENSED PROCESS or is employed to practice a LICENSED PROCESS.
>
> LICENSED PRODUCT includes fiber products, but does not include an entire aggregate mixture including fiber products. For the sake of clarity, if [Polytorx] makes sales of a steel fiber product or product part (or equipment or process for making the same) in combination with other materials (e.g. an aggregate mixture) (or equipment or process for making the same), LICENSED PRODUCT includes only the steel fiber products (or equipment or process for making the same).

The term "licensed processes" was defined as:

> Any process or method that is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the PATENT RIGHTS.

Finally, "patent rights" were defined as U of M's "legal rights under the patent laws of the United States or relevant foreign countries" for:

> (a) the United States and foreign patents and/or patent applications listed in Appendix A;
>
> (b) United States and foreign patents issued from the applications listed in Appendix A and from divisional and continuations (except continuations-in-part) of these applications;
>
> (c) claims in all foreign patent applications, and of the resulting patents, which are directed to subject-matter specifically described in the United States patents and/or patent applications described in (a) or (b) above;

(d)      claims in all patent applications, and of the resulting patents, which are directed to subject matter specifically described as of the Effective Date in the [U of M] Office of Technology Transfer files listed in Appendix A; and

(e)      any reissued or reexamined patents based upon the United States patents described in (a), (b), or (d) above.

Appendix A, referenced in the license agreement, lists three items:

1063   Optimized Fibers for Reinforcement of Cement; Concrete or Ceramic Based Composites, US Patent 5,989,713 (issued 11/23/99)

1063d1   Optimized Fibers for Reinforcement of Cement; Concrete or Ceramic Based Composites US patent 6,060,163 (issued 5/9/00)

1674  Continuous Wire Shaping, Twisting and Cutting Machine [the machine]

Art 2.1 of the license agreement gave Polytorx the exclusive license to make, have made, import, use, market, offer for sale and sell licensed products, and to practice licensed processes. Therefore, to determine if the license agreement gave Polytorx trade secret rights to the machine and design book (production technology), this Court must first determine if those rights were licensed products or licensed processes under art 2.1.

Under art 1.3, a licensed process is any process or method that is covered in whole or in part by an issued, unexpired claim or a pending claim contained in the patent rights. Although patent rights include patents and patent applications listed in Appendix A, and the machine is listed in Appendix A, there is no dispute that U of M never filed a patent application for it. Thus, the machine was not covered in whole or in part by an issued, unexpired claim or a pending claim and could not be a licensed process under art 1.3. Moreover, there is no claim that the design book was covered in whole or in part by an issued, unexpired claim or a pending claim in that appendix. Accordingly, it could not be a licensed process under art 1.3. Because the definition of a licensed product in art 1.2(a) similarly requires the product to be covered in whole or in part by an issued, unexpired claim or a pending claim contained in the patent rights, neither the machine nor the design book—collectively the production technology—could be a licensed product under that part.

Under art 1.2(b), a licensed product is any steel fiber product or product part, which is manufactured by using a licensed process or is employed to practice a licensed process. *Merriam Webster's Collegiate Dictionary* (2003) defines "employ" as "to make use of" and "practice" as "actual performance or application." The process of reinforcing cement with fibers and bars having optimized geometries was covered by the patents listed in Appendix A for Optimized Fibers for Reinforcement of Cement. If the facts established that Polytorx could make use of the machine and design book to perform that process involving cement, the production technology could have been a licensed product. Therefore, under art 2.1, U of M gave Polytorx an exclusive right to make, have made, import, use, market, offer for sale and sell the machine and design book.

-11-

But the focus of Polytorx's trade secret claims against defendants is that U of M also promised to keep the design book and machine confidential. The circuit court questioned the value of an agreement to make, have made, import, use, market, offer for sale and sell the machine and design book if it was public and unpatented information. But, according to the plain language of the license agreement, Polytorx did not bargain for any secrecy. Rather, the focus of the agreement is on issued, unexpired claims, and pending claims. There is no language requiring U of M to obtain or maintain any additional patents, and the parties did not bargain to protect the secrecy of products or processes unless they were patented. Polytorx cites article 11.4(c), which requires, upon Polytorx's termination of the license agreement, to "return[] any confidential or trade-secret materials provided to [Polytorx] by [U of M] in connection with this Agreement, or, with prior approval by [U of M], destroys such materials, and certifies in writing that such materials have all be returned or destroyed." This article did not require U of M to keep anything secret, but instead, only required Polytorx to return unspecified trade secret materials. Because this article makes no reference to U of M keeping the production technology secret, it is inapposite.

In sum, there is no genuine issue of material fact that the license agreement did not require U of M to protect any trade secrets related to the production technology.[7]

B

Polytorx claims that, even if the license agreement did not require U of M to protect any trade secrets in the production technology, U of M was nevertheless obligated to do so by other promises made to Polytorx. We disagree.

The license agreement specifically provided that "[U of M] and [Polytorx] agree that this Agreement sets forth their entire understanding concerning the subject matter of this Agreement, and no modification of the Agreement will be effective unless both [U of M] and [Polytorx] agree to it in writing." Therefore, no agreements regarding confidentiality preceding the license agreement could control unless they were incorporated into the license agreement and any subsequent modifications were required to be memorialized according to the merger clause.

In response to defendants' motion for summary disposition, Polytorx offered evidence of dealings with U of M before the license agreement was entered, including the signing of NDAs. Polytorx also alleged in the complaint, without offering independent evidence, that when Pinkerton completed his graduate studies, he turned over the design book, drawings, and instructions for use to Naaman, U of M required the pages of the design book to be stamped "confidential," and it was understood that all information and any further research surrounding the machine, process, and technology was to be confidential and proprietary and performed under Naaman. None of these prior agreements regarding confidentiality, however, were incorporated in the license agreement involving production technology. Because the license agreement provided that it set forth the parties' "entire understanding concerning the subject

---

[7] In light of this conclusion, we decline to consider defendants' arguments regarding law-of-the-case and collateral estoppel.

matter of this Agreement," Polytorx could not rely on any prior agreements to establish a right to a trade secret in the production technology.

Similarly, in the complaint, Polytorx also alleged that sometime in 2003 it was agreed that NDAs would be obtained from anyone working on the process, technology, and machine in the graduate studies program. Naaman and El-Tawil also signed NDAs. It is unclear from the complaint if Polytorx was claiming that these NDAs occurred before or after the license agreement was entered in June 2003. If they occurred before, they were not incorporated in the license agreement and could not be relied upon to establish a trade secret in the production technology. If they occurred after, the license agreement required any modifications to be in writing and involve both the parties. There is no allegation, and Polytorx offered no independent evidence, that any NDAs between U of M, Polytorx, and anyone working in the graduate studies program were entered to modify the license agreement. A mere possibility that the claim might be supported by evidence at trial is insufficient to survive summary disposition. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). Therefore, Polytorx could not rely on the NDAs to establish a trade secret in the production technology.

In its complaint and response to U of M's motion for summary disposition, Polytorx raised the issue that a subsequent agreement modified the license agreement by claiming—after the license agreement was entered, the parties agreed not to seek a patent for the production technology and instead agreed to keep it confidential as a trade secret. Polytorx did not offer any evidence to support its claim regarding the modification. Although affidavits attached to the response to the motion for summary disposition from Orabone and John Cunningham, a U of M employee, suggest that they believed the production technology would be treated as a trade secret, they averred that this belief stemmed from negotiations and the license agreement, itself, and did not attest to events occurring after the parties entered the license agreement.

U of M argued below that the license agreement had not been modified because there was no *written* agreement, as required by the merger clause, regarding keeping the production technology confidential as a trade secret. Polytorx's counsel countered at a summary disposition hearing, "I think it was more via written correspondence" and email correspondence evidencing the agreement could be discovered with further discovery. When "a party opposes a motion for summary disposition on the ground that discovery is incomplete, the party must at least assert that a dispute does indeed exist and support that allegation by some independent evidence." *VanVorous v Burmeister*, 262 Mich App 467, 478; 687 NW2d 132 (2004) (citation and quotation marks omitted). Here, aside from counsel's unsupported claims about emails, there was no independent evidence that a factual dispute regarding a modification to the license agreement existed. We reject Polytorx's claim that it lacked time to offer independent evidence because, even if Polytorx did not learn of U of M's merger clause argument until the summary disposition hearing, as it claims, Polytorx had itself claimed the license agreement was modified much earlier and offered no supportive evidence. Again, a mere possibility that the claim might be supported by evidence at trial is insufficient to survive summary disposition. *Maiden*, 461 Mich at 121.

Because no genuine issue of material fact exists regarding whether U of M was obligated to protect any trade secrets in the production technology, any claim against defendants involving trade secrets required dismissal, including count II (misappropriation of confidential, proprietary

information, and trade secrets), count III (statutory and common law conversion of confidential, proprietary information, and trade secrets),[8] and count IV (unjust enrichment from the misappropriation of confidential and proprietary information and trade secrets). The portion of the tortious interference claim in count I asserting damages resulting from the disclosure of trade secrets to the public domain, as well as the claim of civil conspiracy in count V, to the extent that the underlying claims of tortious interference, misappropriation, conversion, and unjust enrichment were based on confidential and proprietary information and trade secrets, also should have been dismissed.

C

Defendants finally argue that any of the portions of Polytorx's claims, including tortious interference and civil conspiracy, which did not involve trade secrets, should have been time-barred. We agree.

The period of limitations for a tortious interference claim is three years. MCL 600.5805(10); *James v Logee*, 150 Mich App 35, 38; 388 NW2d 294 (1986).[9] In a tort action, a limitations period begins to run "at the time all elements, including damages, can be alleged in a proper complaint." *Blazer Foods, Inc*, 259 Mich App at 254.

> The elements of a tortious interference with a business relationship are: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) a resulting damage to the plaintiff. [*Dalley v Dykema Gossett*, 287 Mich App 296, 323; 788 NW2d 679 (2010) (quotation marks and citation omitted).]

To succeed on such a claim, "the plaintiff must allege that the interferer did something illegal, unethical or fraudulent." *Id*. at 324. Similarly, the elements of tortious interference with a contract are: "(1) the existence of a contract, (2) a breach of the contract, [] (3) an unjustified instigation of the breach by the defendant," and (4) resulting damage to the plaintiff. *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 90; 706 NW2d 843 (2005).

---

[8] The trial court found a question of fact regarding whether the conversion of the physical property, including the machine and design book, as opposed to the confidential and proprietary information and trade secrets related to the machine and design book resulted in damages. But in the complaint, Polytorx only alleged damages from the conversion of confidential and proprietary information and trade secrets. It made no claim for damages from the conversion of the physical property.

[9] Polytorx cites no statutory provision triggering the discovery rule for these claims. *Trentadue,* 479 Mich at 388-392.

Polytorx generally asserted that defendants harmed its reputation by slandering the product and used knowledge, technology, and the machine for commercial purposes thereby interfering with the license agreement. But, as we addressed earlier in this opinion, Polytorx was aware of defendants' actions as early as 2007, when it sent complaints to U of M. As a result, the three-year statute of limitations had expired by May 13, 2013, when Polytorx filed its complaint in the circuit court. Any claim of tortious interference was time-barred and should have been dismissed. In addition, any civil conspiracy claim based on these time-barred tortious interference claims should have also been dismissed.[10]

We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Joel P. Hoekstra
/s/ Kurtis T. Wilder

---

[10] In the application for leave to appeal, defendants did not raise the issue of personal jurisdiction over Dong Joo Kim. This Court granted leave to appeal and limited review to the issues raised in defendants' application. *Polytorx LLC v Naaman*, unpublished order of the Court of Appeals, entered May 19, 2014 (Docket No. 320989). Therefore, we decline to specifically consider the personal jurisdiction claim. See *People v Farquharson*, 274 Mich App 268, 279; 731 NW2d 797 (2007).